**Daniel Lee LEWIS, Petitioner–Appellant,**

v.

**D.A. MAYLE, Respondent–Appellee.**

**No. 03–16152.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 2004.

Filed Nov. 29, 2004.

J. Toney, Woodland, California, for the petitioner-appellant.

Catherine G. Tennant, Deputy Attorney General, Sacramento, CA, for the respondent-appellee.

Before FERGUSON, REINHARDT, and PAEZ, Circuit Judges.

FERGUSON, Circuit Judge:

This case involves a murder that only one of two people could have committed: the appellant, Daniel Lee Lewis, or his

nephew, Steven Berg. Lewis was convicted of second degree murder and sentenced to an aggregate term of 95 years to life. Berg served as the primary witness for the prosecution. Despite the antagonistic positions of the two men, Lewis was represented at trial by a lawyer who had represented Berg on another matter immediately prior to undertaking Lewis' defense.

Lewis contends that this successive representation presented a conflict of interest that adversely affected his defense. The California Court of Appeal rejected Lewis' conflict of interest claim and affirmed the judgment. The U.S. District Court for the Eastern District of California denied his federal habeas petition. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We both reverse and remand with directions to grant the habeas petition.

## I. Factual and Procedural Background

### A. *Evidence Relating to the Crime*

Kurtis Mitchell was killed by a shotgun blast in El Dorado County, California, on June 22, 1996. A few days before the shooting, Lewis and Tori Grimm, Lewis' employee and close friend, found Mitchell at Lewis' house. Mitchell claimed to be retrieving some belongings that he had stored there. He took a rifle that he thought belonged to his girlfriend, but that actually belonged to Lewis' wife. Mitchell accused Grimm of wearing Mitchell's clothes, and a fight ensued between Mitchell, on one side, and Lewis and Grimm, on the other. Lewis ordered Mitchell off his property. Shortly thereafter, Mitchell called Lewis and said, "You're all dead."

On June 21, Lewis reported the fight and theft of the rifle to the Sheriff's Department. Lewis also called his landlord and friend, Frank Vilt, who had worked as a U.S. marshal, to mediate the dispute with Mitchell, to alert police to Mitchell's possession of the rifle, and to prepare a restraining order to keep Mitchell away from Lewis' family. Lewis' wife and children moved into a hotel.

Berg, Lewis' nephew, learned about Mitchell's theft and threats the next day at Lewis' house. Although Lewis had told Berg that Mitchell's threat was against the entire family, including Berg, Berg testified later that he did not feel threatened by Mitchell because they were friends. However, later in the afternoon, Berg borrowed a shotgun and shells from his neighbor and told him that there were "some problems up on the mountain" and that he did not "want to walk into a situation where [he] would be caught with [his] pants down." Berg recovered the rifle that Mitchell had taken, which had been retrieved by a third person from Mitchell earlier that day.

Several witnesses testified at trial that Lewis was very upset over Mitchell's theft and threats. Berg testified that he saw Lewis with a sawed-off, double-barrel shotgun, and that Lewis spoke of settling matters with Mitchell.[1]

Berg claimed that he proceeded to Mitchell's barn, where Mitchell lived, and warned him that Lewis was on his way. Berg then went inside the barn to smoke methamphetamine. Berg testified that through the barn door, he saw Lewis arrive and argue with Mitchell. He claimed that Lewis pointed his gun at Mitchell and said, "You disrespected my family … it's time to pay," and then fired. Berg's face and clothing were spattered with blood and tissue. Lewis then ran off.

Berg and his girlfriend drove to Berg's home. En route, one of them tossed

---

**1.** The prosecution implied that this shotgun was used to kill Mitchell. The shotgun was never found, and Grimm testified that he did not see Lewis with a gun that night.

Berg's spattered T-shirt out of the car. Berg showered when he got home, cleaned his remaining clothes, and cleaned the shotgun and shells that he had borrowed from his neighbor. He later threw away his bloody tennis shoes and cleaned his car, which was also spattered, at a car wash. The next day, Berg returned the gun and contacted the sheriff's department about the murder.

Evidence presented at trial showed that Mitchell was found dead just outside the barn door, and that considerable blood and tissue spatter were found in the barn. Experts testified that heavy spatter could be expected on someone in back of, or to the side of, Mitchell, and that the forensic evidence did not contradict Berg's account of the position of the three individuals. The shotgun that Berg alleged he had earlier seen on Lewis was never found. The shotgun pellets recovered from Mitchell and the murder scene also did not match the shells that Berg had obtained from his neighbor.

Lewis' half-brother testified that Berg had told him that Lewis was not present when Mitchell was killed, and that Berg said the gun went off when Mitchell attempted to grab the gun out of his hand.

### B. *Evidence Relating to the Alleged Conflict*

From late 1995 through mid–1996, attorney David Weiner represented Berg on a felony charge of driving under the influence of alcohol (DUI) in Sacramento County. In July 1996, Weiner withdrew from representing Berg in order to defend Lewis on charges of murder in El Dorado County. In December 1996, after Berg had pled no contest to DUI, and admitted several prior DUI convictions, he was placed on probation for the offense.

Weiner stated later, during a hearing on a motion for a new trial, that Lewis' family had approached him to represent Lewis. Berg offered to pay part of Weiner's fee, and family members asked Berg to sell his car in order to contribute to Lewis' defense.

In August 1996, Lewis and Berg signed nearly identical waivers of any conflict of interest. Lewis' waiver provided:

ADVISEMENT

NOTICE IS HEREBY GIVEN that pursuant to Rules of Professional Conduct, Rule 3–300, *California Rules of Court* (1996), you are advised as follows:

1. David Weiner, attorney at law, has represented Steve Berg in the Sacramento County Case Number 95F09958. David Weiner has recently withdrawn from that case with the court's approval in Sacramento County for reasons that there is a conflict of interest between Steven Berg and Daniel Lewis;

2. Steven Berg is a prosecution witness potentially adverse to Daniel Lewis in connection with the charges pending against him in El Dorado County;

3. Steven Berg has been advised of his rights pursuant to Rules of Professional Conduct, Rule 3–300, *California Rules of Court* (1996), and has consented to David Weiner's representation of Daniel Lewis in connection with the El Dorado County case pending;

4. Daniel Lewis, because of the conflict of interest between Steven Berg and Daniel Lewis, is advised to seek the advice of an independent lawyer to discuss the ramifications of being represented by David Weiner in view of his past representation of Steven Berg.

Dated: *8–8–96*

I have read the above Advisement and also the Advisement and Consent that was executed by Steven Berg, and hereby consent to and request that David Weiner represent me in the charges

presently pending against me in El Dorado County.

Dated: *8–8–96*

The parties also discussed the potential conflict in a preliminary hearing in which the state court confirmed that Lewis and Berg waived any potential conflicts of interest. The judge advised Lewis, "[N]ormally it would be a conflict of interest and inappropriate for an attorney to represent a defendant when he's an attorney of record for a prosecution witness," and asked whether Lewis understood that rule. After Lewis told the judge that he waived the conflict, the judge asked, "And your lawyer has fully explained to you the implication of this?" Lewis answered, "Yes." Lewis, however, never obtained independent counsel to advise him of the ramifications of waiving the conflict.

Frank Vilt later declared in an affidavit submitted with Lewis' motion for a new trial that Berg came to his house after signing the waiver and stated, "Weiner will be representing my uncle but he will never turn on me, that is my insurance policy. I have an insurance policy, I'm no fool." In his own declaration, Berg denied making this statement.

At trial, Weiner raised the question of whether it was Berg who actually shot Mitchell. On cross-examination, Berg admitted that he had consumed a large quantity of alcohol and methamphetamine shortly before the murder. Berg also admitted that he was a convicted felon and was illegally in possession of a firearm. Weiner questioned Berg at length about why he had cleaned the shotgun and shells. Weiner also pointed out inconsistencies in Berg's testimony. Although the prosecution, on direct examination, had elicited an admission from Berg that he had been convicted of four separate burglary charges, Weiner did not question Berg about his most recent 1995 DUI charge or

about his probation status. He also did not bring out the fact that Berg was in a substance abuse treatment program as a condition of his probation or that Berg had helped arrange for Weiner to represent Lewis and offered to pay his fee.

During his closing argument, Weiner argued that the case was a credibility contest between Berg and all of the other witnesses and physical evidence. He argued that Berg had shot and killed Mitchell, and that if Berg were on trial for murder, the evidence against him would be overwhelming.

## C. *Motion for a New Trial*

After Lewis' trial, Robert Blasier replaced Weiner as Lewis' counsel. Lewis filed a motion for a new trial in May 1997, in which he alleged, *inter alia,* ineffective assistance of counsel. Blasier examined Weiner at the evidentiary hearing about several alleged shortcomings in his representation.

In addition to Weiner's testimony, Blasier conducted an independent investigation that yielded new witnesses. One witness was Vilt, who declared that he had provided Weiner with the names and addresses of several witnesses who were willing to testify at trial. Vilt declared that he told Weiner about witnesses who could testify that: Berg was a "chronic liar"; Berg had asked about "hair triggers" just days after the shooting; a few hours before the shooting, Berg had a shotgun and said he was going to "dust someone"; and Berg confessed to killing Mitchell.

## D. *California Court of Appeal*

The Court of Appeal found that the alleged conflict of interest did not warrant a reversal of Lewis' conviction. The court first opined that Lewis had "arguably" waived any conflict of interest claim since

he was aware of his right to conflict-free representation and had waived that right by signing a valid written waiver and discussing the conflict at a preliminary hearing. The court held that, even if the waiver was not valid, Lewis failed to establish a Sixth Amendment violation because any alleged conflict of interest did not adversely affect his attorney's performance at trial.

The court then turned to Lewis' other claims. It held that Weiner did not provide ineffective assistance of counsel because, while he may have failed to act competently, there was not a reasonable probability that Lewis would have fared better had Weiner impeached Berg with his felony DUI conviction and probation. In response to Lewis' claim that Weiner failed to investigate the case adequately, the court found that Weiner had competently investigated, or, in the alternative, even if he had not adequately investigated, there was not a reasonable probability that Lewis would have fared better with the evidence submitted after trial.

## II. Discussion

### A. *Standard of Review*

◼ This Circuit reviews *de novo* a district court's decision to grant or deny a petition for habeas corpus. *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir.2000).

◼ This petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a federal court may grant habeas relief to a petitioner in state custody only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or if the decision was based on "an unreasonable determination of the facts in light of the evidence pre-sented." 28 U.S.C. § 2254(d). As we have explained, however, "we still look to our own law for its persuasive authority in applying Supreme Court law.... Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law." *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir.2000), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (quoting *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir.1999)).

### B. *Waiver*

◼ The Sixth Amendment right to counsel includes a correlative right to representation free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Lewis contends that his representation at trial by David Weiner presented a conflict of interest that adversely affected his defense. We must first determine whether Lewis validly waived his right to conflict-free counsel. We conclude that he did not.

The California Court of Appeal considered the government's waiver argument and deemed the waiver "arguably" sufficient. However, the court explicitly stated that it was not "relying on the waiver to resolve the conflict issue" but was instead examining whether the alleged conflict adversely affected Lewis' representation. Noting that Berg was the principal prosecution witness and only other possible suspect, and that Weiner was representing him at the time he agreed to represent Lewis, the court stated:

> These vital ties mandate a closer look at the potential conflict, in line with the principles that we must indulge "every reasonable presumption against the waiver of unimpaired assistance of counsel" and that defendant must be "ad-

vised of the *full range* of the dangers and possible consequences of the conflicted representation in his case." (citation omitted) (emphasis added by state Court of Appeal)

For these reasons, the Court of Appeal refused to hold on waiver, but proceeded to examine the merits of the conflict of interest claim.

■ De novo review, rather than AEDPA's deferential standard, is applicable to a claim that the state court did not reach on the merits. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir.2003). Here, the state court reached the merits of Lewis' conflict of interest claim, but in examining that claim, did not resolve the waiver issue. The principle that comity and federalism concerns are not implicated where a state court does not reach a claim applies here with equal force. Because the state court explicitly held on other grounds, we do not apply AEDPA deference to its discussion of Lewis' waiver.

Our standard of review is not controlled by *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000). There, we held that where a state court provides no rationale for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was "objectively unreasonable" based on its independent reading of the record. Here, however, the state court was not silent as to its reasoning; rather, it specifically declined to hold that Lewis validly waived his right to non-conflicted counsel, and resolved Lewis' conflict of interest claim on other grounds. Therefore, we review de novo whether Lewis waived his right to conflict free counsel, while deferring to any factual findings made by the state court under 28 U.S.C. § 2254(e)(1).

■ A defendant may waive his right to the assistance of an attorney who is unhindered by conflicts. *Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). A valid waiver of conflict of interest must be voluntary, knowing, and intelligent, such that the defendant is sufficiently informed of the consequences of his choice. *Belmontes v. Woodford*, 350 F.3d 861, 885 (9th Cir.2003). We are required to "ascertain with certainty" that a defendant knowingly and intelligently waived that right by "focusing on what the defendant understood." *Lockhart v. Terhune*, 250 F.3d 1223, 1233 (9th Cir.2001) (citations omitted).

Here, the state Court of Appeal found that Lewis signed a written waiver, discussed the potential conflict with Weiner, and was advised to seek outside counsel on the matter. It also found that Lewis was "generally advised of the dangers and possible consequences" arising from the conflict, including the fact that Berg would be a witness for the government. We presume these factual findings to be correct. 28 U.S.C. § 2254(e)(1). However, there is no evidence that Lewis understood "any of the specific ramifications of his waiver," 250 F.3d at 1233, since he did not seek the advice of outside counsel and had only a cursory discussion with the judge. *Cf. Garcia v. Bunnell*, 33 F.3d 1193, 1196–98 (9th Cir.1994) (finding a waiver valid where the defendant had an extensive discussion with the judge about the conflict, received a continuance to consult with his family on the matter, and clearly understood his right to unbiased counsel).

In *Belmontes*, we concluded that a defendant was not sufficiently informed of the consequences of a waiver, in part because he was not told that his attorney owed a continuing duty of loyalty to a former client whom the defendant now implicated in the murder. 350 F.3d at 885. Here, too, there is no evidence that Lewis was told that Weiner had any continuing

obligations to Berg. Even if Lewis understood the theoretical risk of an attorney being biased towards a former client, and dismissed that risk as unlikely, it is less likely that he foresaw other potential consequences of the waiver—for instance, the fact that the charges on which Weiner previously represented Berg might provide material for impeachment.

We must "indulge every reasonable presumption against the waiver of fundamental rights." *United States v. Allen,* 831 F.2d 1487, 1498 (9th Cir.1987) (citation omitted). Accordingly, we hold that Lewis did not validly waive his right to conflict-free counsel.

### C. *Actual Conflict Adversely Affecting Representation*

■ The Sixth Amendment ensures that a criminal defendant has the right to representation that is free from conflicts of interest and the assistance of counsel whose loyalties are not divided. *Wood,* 450 U.S. at 271, 101 S.Ct. 1097. To obtain relief under the Sixth Amendment, a defendant who does not object to a potential conflict of interest at trial must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). A defendant who makes this showing need not show prejudice to the outcome of the trial. *Id.* at 349–50, 100 S.Ct. 1708.

As we explained, "[u]nder Supreme Court precedent, [a defendant] needs only to meet the lower standard of showing that the 'attorney's behavior seems to have been influenced' by the conflict." *Lockhart,* 250 F.3d at 1231 (quoting *Sanders v. Ratelle,* 21 F.3d 1446, 1452 (9th Cir.1994)). Furthermore, the Supreme Court has noted in cases where there is a joint representation of conflicting interests, "the evil . . . is in what the advocate finds himself com-

pelled to *refrain* from doing." *Holloway,* 435 U.S. at 490, 98 S.Ct. 1173 (emphasis in original).

■ Here, the California Court of Appeal found that the asserted conflict did not adversely affect Lewis' defense. We hold that this conclusion was an objectively unreasonable application of clearly established federal law. As the Court of Appeal noted, Weiner attacked Berg's credibility, emphasizing that he was a convicted felon, a drug addict, and a liar. In addition, Weiner repeatedly suggested to the jury that Berg was the actual murderer. Nevertheless, Weiner refrained from eliciting evidence on at least three significant points as a result of his prior representation of Berg, establishing the requisite adverse effect.

First, Weiner failed to cross examine Berg about his recent felony DUI conviction, the charge on which Weiner had represented him. On direct examination, Berg admitted a 1988 conviction for burglary in El Dorado County, and on redirect, he admitted three earlier burglary convictions in Oregon. At a bench conference, Weiner told the judge that he was satisfied with the prior convictions introduced by the prosecution. Consequently, Weiner failed to impeach Berg with an additional prior burglary conviction and the DUI conviction.

The DUI conviction was significant because the convictions which were introduced were all at least nine years old at the time of trial; Berg's drunk driving conviction, by contrast, was incurred in the year prior to trial. The trial judge himself indicated in a bench conference on Berg's prior offenses that those convictions "closest to today's date would be [most] appropriate" for impeachment purposes. At trial, Berg attempted to portray himself as a reformed man who now had "different

ways to look at life." The introduction of the recent DUI conviction would have challenged that portrayal.

Weiner testified at the hearing on Lewis' motion for a new trial that he did not examine Berg about his DUI conviction because he "didn't believe that was impeachable, by itself, and ... also felt that it was cumulative and not of any real importance." The California Court of Appeal noted that the conviction, as a crime of moral turpitude, could have been used to impeach Berg, and that other counsel would likely have done so.[2] Nevertheless, the court concluded that "it does not appear that the asserted conflict led to this omission; if anything, it was incompetence rather than conflict."

This conclusion was objectively unreasonable. The hearing established that Weiner believed that at least some of the information he had about the DUI conviction was privileged; in fact, Weiner refused to turn over any information relating to his representation of Berg to Lewis' new attorney without a court order. In addition, as the state court recognized, other counsel would have raised the DUI conviction. The fact that Weiner did not, when that conviction clearly had value as the only conviction recently obtained, demonstrates Weiner's reluctance to raise the substance of his former representation of Berg.

Second, Weiner's failure to inform the jury that, at the time of trial, Berg was on felony probation demonstrates that the conflict adversely affected Lewis' defense. The California Court of Appeal concluded that Berg's probation and participation in a court-ordered substance abuse program would have been effective impeachment evidence. The court noted that the fact that the key prosecution witness was on felony

probation was significant. It further noted that the fact that Berg was required to participate in a substance abuse program as a condition of his probation would have countered Berg's attempt to portray himself as having voluntarily undertaken a lifestyle change. However, the court found that Weiner did not raise these issues at trial because he perceived there to be no connection between Berg's probation in Sacramento County and the El Dorado County murder trial.

This finding, too, was unreasonable. Again, given Weiner's post-trial reluctance to turn over any information relating to the DUI case, it is evident that the conflict made him reluctant to broach the probation issue at trial. Although the state court relied on Weiner's explanation for this omission, we have previously urged caution in accepting an attorney's after-the-fact justifications for his or her behavior. "The existence of a conflict of interest cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir.1994). "Human self-perception regarding one's own motives for particular actions in difficult circumstances is too faulty to be relied upon, even if the individual reporting is telling the truth as he perceives it." *United States v. Shwayder*, 312 F.3d 1109, 1119 (9th Cir. 2002), *as amended by* 320 F.3d 889 (9th Cir.2003). The state Court of Appeal unreasonably accepted Weiner's explanations at face value.

 When considered not in isolation but in conjunction with Weiner's failure to impeach Berg on the conviction, Weiner's

---

**2.** The Court of Appeal noted that a felony DUI conviction incurred within seven years of three or more DUI convictions is a crime of moral turpitude.

failure to raise the probation issue appears even more evidently linked to the conflict.[3] Having recognized that Weiner's omissions were significant, the Court of Appeal unreasonably dismissed them as unrelated to the conflict.

Third, Weiner failed to elicit information from Berg about his role in arranging for Lewis' defense. In a declaration submitted to the state court, Blasier stated that Weiner told him that Berg had offered to pay part of Weiner's fee. In addition, Berg testified at trial that a family member had asked him to sell his car to raise money for Lewis' defense. Finally, Vilt submitted a declaration stating that Berg told him that "Weiner will be representing my uncle but he will never turn on me … that is my insurance policy." Yet Weiner never questioned Berg about his role in arranging for Lewis' defense.

The Court of Appeal concluded that nothing in the record indicated that Berg controlled Weiner in any way, and that Weiner "spared no punches in attacking Berg's character." This analysis was unreasonable because the state court focused only on whether Berg actually influenced Weiner, rather than on whether the conflict prevented Weiner from making an issue of Berg's involvement. In a case where so much turned on the credibility of one prosecution witness, a suggestion that that witness *sought* to influence the defense in any way—regardless of whether he succeeded in doing so—could have raised a reasonable doubt in the mind of jurors.

■ With respect to the evidence raised by Vilt, Weiner testified that he did not think Vilt was a credible witness.[4] But even leaving aside Vilt's claims, uncontradicted evidence showed that Berg offered to pay Weiner to represent Lewis. Had a non-conflicted lawyer represented Lewis and come across evidence that the only other possible suspect, and the prosecution's main witness, had offered to pay for the defense, the non-conflicted lawyer undoubtedly would have raised that evidence to impeach the prosecution witness. It seems more than likely that Weiner did not raise this evidence because of discomfort at revealing his prior relationship with Berg. Weiner might have also feared that, if he were to raise Berg's offer to pay for Lewis' defense, he himself risked becoming a witness at trial—a situation that could have required him to withdraw as counsel. Therefore, we find that Weiner's decision not to elicit evidence of Berg's role in arranging for Lewis' defense constituted an adverse effect of the conflict.

## III. Conclusion

The potential for a severe conflict of interest in this case was readily apparent from the outset. The state trial judge

---

**3.** During the motion for a new trial, Blasier stated: "The Court is reminded that in the waiver signed by Mr. Berg, it even states—Mr. Weiner states in there, 'You may be able to gain some consideration from Sacramento County as a result of your cooperation in this case.'" If Weiner did make such a suggestion, it would cast doubt on his later testimony that he saw no connection between the cases. The record does not contain a copy of Berg's waiver, although the California Court of Appeal described it as "nearly identical" to Lewis' waiver. Because we cannot verify this fact, we do not rely on it in our decision.

**4.** Weiner stated in the hearing that his opinion of Vilt's credibility was based on experiences with Vilt both prior to and during the Lewis case. Vilt had done investigative work for Weiner in earlier cases. In addition, Vilt was removed from his position of deputy U.S. marshal on charges of issuing bad checks, failure to pay debts, and inattentiveness to duty. Nevertheless, the prosecution called him as a witness to testify to Lewis' anxiety following his spat with Mitchell.

should never have let a conflicted attorney represent Lewis. The risks were simply too great.

Lewis has shown that the potential conflict indeed developed into an actual conflict of interest that adversely affected his representation. The state court's decision rejecting the claim was an unreasonable application of clearly established federal law. Accordingly, we reverse the District Court and remand with directions to grant the habeas petition.

**REVERSED and REMANDED.**